**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

---

|  |  |
|---|---|
| LAQUANDA ALLEN AND LYDRICKA JONES, individually and on behalf of all others similarly situated, | Case No. |
| | JURY TRIAL DEMANDED |
| *Plaintiffs*, | |
| v. | |
| PROCTER & GAMBLE COMPANY, and NEHEMIAH MANUFACTURING COMPANY, | |
| *Defendants.* | |

---

**CLASS ACTION COMPLAINT**

Plaintiffs, LAQUANDA ALLEN and LYDRICKA JONES, individually, and on behalf of all other similarly situated persons, by and through their undersigned counsel, bring this Class Action Complaint against Defendants, PROCTER & GAMBLE COMPANY and NEHEMIAH MANUFACTURING COMPANY.

**SUMMARY OF THE CASE**

1.      Defendants, Proctor & Gamble Company and Nehemiah Manufacturing Company (hereinafter referred to as "G&P", "NMC", or collectively as "Defendants") deceptively market several lines of personal hygiene moistened wipes ("wipes") as "flushable."  Defendants charge a premium for these "flushable" wipes, as compared to wipes that are not marketed as "flushable."

2.      In fact, the allegedly "flushable" wipes are not suitable for disposal by flushing down a toilet as they routinely damage or clog pipes, septic systems, and sewage pumps.

3.      Defendants knowingly and purposefully failed to disclose to their consumers that their "flushable" wipes do not disperse, disintegrate, nor are biodegradable like toilet paper; and they are not regarded by municipal sewage systems as appropriate to flush down a toilet.  To this day, Defendants have taken no meaningful steps to clear up consumers' misconceptions regarding their product.

4.      Defendants mislead consumers into believing that the products are suitable for disposal by flushing down a toilet and thus consumers are willing to pay a premium price for the products that they would otherwise not pay.

5.      Defendants' actions cause significant harm by clogging pipes, septic systems and sewage pumps.

6.      As a consequence of Defendants' unfair and deceptive practices, Plaintiffs, and members of the Class, purchased Defendants' "flushable" wipes under the false impression that, by purchasing Defendants' products they would be receiving products that were in fact "flushable," and suitable for disposal by flushing down a toilet.

7.      Defendants obtained substantial profit from the deceptive sales of their product.

8.      For the reasons stated herein, Defendants' "flushable" wipes sold in Florida, and throughout the United States, are misbranded and illegal.

9.      Plaintiffs now seek to stop Defendants' unlawful conduct by requiring Defendants to disgorge all profits obtained from their false and deceptive marketing practices, pay restitution and damages to purchasers of the wipes, to remove the word "flushable" from their packaging and marketing, and to affirmatively inform purchasers that the wipes are not suitable for flushing down a toilet.

## PARTIES

10.     Plaintiff Allen first discovered Defendants' product while shopping for grocery items at her local Wal-Mart Supercenter. After comparing several brands of wipes, Plaintiff chose to pay a premium price for Defendants' product over that of Defendants' competitors solely due to that fact that the label claimed the product was "flushable" and safe to dispose of by flushing down a toilet. Plaintiff purchased a Charmin Freshmates Flushable Wipes (480 wipes) for $29.64 (or $0.062 per wipe) from Walmart.  Due to Defendants' deceptive practice of false advertising, Plaintiff paid a premium price for Defendants' product when a competitor's product having no false claim of "flushable" was available at a much lower price. For example, a consumer can purchase a 448 count pack of Pampers Sensitive Wipes, a non-flushable product, for only $10.97 (or $0.024 per wipe) at Walmart. This amounts to approximately a 160% price premium.  Plaintiff Allen purchased Defendants' "flushable" wipes in or about August 2014, at her local Walmart store.

11.     Plaintiff Allen used Defendants' product as directed for a hygienic purpose for her children. As the product advertises, after each use Plaintiff would dispose of the "flushable" wipes by flushing them down her toilet. Plaintiff almost immediately began experiencing problems with her plumbing and septic system. After unclogging her toilet on several occasions, Plaintiff noticed how the toilet paper was partially broken down while the wipe was fully intact.

12.     Plaintiff Jones purchased Defendants' "flushable" wipes in or about October 2014 online at www.diapers.com. While shopping for items intended for infant care, Plaintiff chose to purchase Defendants' product over that of the competitors due to the "flushable" feature advertised on Defendants' product label.  Plaintiff chose to pay a higher premium price for Pampers Kandoo Flushable Wipes Sensitive 250 count pack for $13.49 (or $0.054 per wipe)

after seeing Defendants' "Flushable Wipes" advertisement on the package.  Due to Defendants' deceptive practice of false advertising, Plaintiff paid a premium price for Defendants' product when a competitor's product having no false claim of "flushable" was available at a much lower price. For example, a consumer can purchase a 320 count pack of Pampers Sensitive Wipes, a non-flushable product, for only $10.19 (or $0.031 per wipe) at the same website. This amounts to approximately a 75% price premium.

13.     Plaintiff Jones has an infant to care for as well as other young children. In hopes of easing her routine and reducing the amount of waste, Plaintiff purchased Defendants' product solely for the advertised "flushable" feature. After using the product as directed, Plaintiff experienced numerous occasions of clogged toilets due to the wipes not properly dissipating in the wastewater. After experiencing frequent plumbing problems, Plaintiff stopped using Defendants' "flushable" wipes.

14.     Plaintiffs were willing to pay a premium price for wipes that were advertised to be "flushable."  Based on the "flushable" representation on Defendants' labels, Plaintiffs and members of the Class reasonably believed the products they purchased were in fact "flushable" and relied on this representation in making the purchases thereof.

15.     Not only did Plaintiffs purchase the "Flushable" wipes because the label said they were "flushable" and appropriate for disposable by flushing them down a toilet, Plaintiffs also paid more money for the products than they would have paid for other similar products that had no claims of being "flushable."

16.     Had Plaintiffs known the truth—that the Defendants' wipes were not "flushable"— they would not have purchased these products, and would not have paid the premium price for same.

## JURISDICTION

17.     Plaintiffs are residents of this District.  During the class period, Plaintiffs were exposed to and saw Defendants' advertising and packaging claims, purchased Defendants' products in this District in reliance of Defendants' claims, and suffered injury in fact and lost money as a result of the unfair and deceptive trade practices of the Defendants.

18.     Defendant P&G is a corporation incorporated under the laws of Delaware, with its principal place of business located in Cincinnati, OH.

19.     Defendant NMC is a corporation incorporated under the laws of Delaware, with its principal place of business located in Cincinnati, OH.

19.     Defendants produce, advertise, market, sell and distribute "Charmin Freshmates® Flushable Wipes ("Charmin Wipes") and Pampers® Kandoo® Flushable Wipes ("Pampers Wipes") throughout the United States, including in this State, District, and Division.

## JURISDICTION AND VENUE

20.     This Court has original jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action in which: (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; (2) a member of the class of Plaintiffs is a citizen of a State different from the Defendants; and (3) the number of members of all proposed Plaintiff classes in the aggregate is greater than 100.

21.     This Court has personal jurisdiction over Defendants because a substantial portion of the wrongdoings alleged herein occurred in Florida. Defendants also have sufficient minimum contacts with Florida, and have otherwise intentionally availed themselves of the markets in Florida through the promotion, marketing, and sale of products sufficient to render the exercise

of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

22.    Venue is proper in this District pursuant to 28 U.S.C. § 139(b)(2) and (3) because a substantial part of the events or omissions giving rise to these claims occurred in this District, a substantial part of the events or omissions giving rise to the claim occurred within this District, Defendant caused harm to Plaintiffs in this District,  and Defendants are subject to the Court's personal jurisdiction with respect to this action.

## FACTS RELEVANT TO ALL CLAIMS

23.    P & G is a manufacturer and marketer of consumer product goods, including a variety of paper products, such as toilet paper, paper towels, feminine hygiene products, diapers, and baby wipes. Its products are widely available for purchase in supermarkets, drug stores, and other retailers.

24.    P & G operates a program called "Connect + Develop," in which it partners with smaller manufacturers, licensing them to smaller product lines for them to develop in conjunction with P & G. In addition to licensing the product, P & G provides "Connect + Develop" participants with its research and development and marketing expertise to help bring new products to market faster.

25.    NMC is a participant in P & G's "Connect + Develop" program. It is a licensee of several P & G's products, including the line of paper products for toddlers known as Pampers Kandoo.

26.    Among P & G's products are a variety of pre-moistened cloths, known as wet wipes, wipes, or moist towelettes, that can be used for personal hygiene, child care needs, pet car, or cleaning. The two pre-moistened cloth products at issue in this case are:

    a.   Charmin Freshmates® Flushable Wipes ("Charmin Wipes")

    b.   Pampers® Kandoo® Flushable Wipes ("Pampers Wipes")

In this Complaint, these products will be collectively referred to as the "Flushable Wipes."

27.    P & G manufactures and markets the Charmin Wipes.

28.    While P & G invented the Pampers Wipes, and invested in the initial research and development and marketing of those wipes, since 2009, P & G had shared responsibility with NMC for the manufacturing and/or marketing of the product. For example, P & G owns the websites www.kandookids.com and www.pampers.com, of which both websites market the Flushable Wipes.

29.    Through the use of intentional misrepresentations and selective omissions, Defendants deceptively mislead consumers to believe that these products are in fact flushable. None of the products are safe and appropriate for flushing down a toilet, as the "Flushable Wipes" do not disintegrate or disperse quickly like toilet paper. Rather, even under optimal, lab-created conditions, the Flushable Wipes take hours to begin to break down.

30.    Specifically, as a result of the slow deterioration process, the Flushable Wipes, when subjected to ordinary, consumer use, routinely (1) clog pipes; (2) do not break down properly in septic tanks which results in damaged septic pumps; and (3) creates blockages and damage to municipal sewage lines and pumps, often as a result of proclivity of the Flushable Wipes to tangle with each other, tree branches, rocks, and other non-flushable items, and form large masses or ropes.

31.    All of the Flushable Wipes packages state that the product is "flushable" but the Flushable Wipes are not, in fact, suitable for flushing down a toilet.

32.     As defined by Webster's Dictionary, "flushable" means "suitable for disposal by flushing down a toilet."

33.     Many objects and materials theoretically will pass from the toilet to the pipes after one flushes, such as food scraps, jewelry, small toys, or cotton swabs, but that does not make such objects or materials "flushable." Rather, the word "flushable" means in reasonable usage that the object or material is *appropriate or suitable* to flush down a toilet for purposes of passing into the sewer or septic system.

34.     The Water Environment Federation ("WEF"), a nonprofit association of water quality professionals, has explained how Defendants are misusing the word "flushable":

> The industry reference for dispersability is two-ply toilet paper … [which] starts to break apart when the toilet is flushed and is indistinguishable in the wastewater system in a matter of seconds … Anything labeled as flushable should start to break apart during the flush and completely disperse within 5 minutes … Our mantra is, 'It's not flushable if it's not dispersible' …[1]

35.     WEF additionally reports that consumers flush nondispersible wipes because the product they purchased are falsely advertised as "flushable," when in fact they do not disperse like toilet paper.

35.     Related associations, such as municipal water facilities and water protection organizations, agree with the WEF that the only product other than human excrement appropriate for disposal down a toilet is toilet paper. For example, the California Association of Sanitation Agencies has expressed:

> Many personal hygiene wipes and cleaning products are marketed as being "flushable." But despite the confusing and misleading labels you should never flush "flushable" or "disposable" products. No matter what a label says, the only items you should flush are human waste and toilet paper. Just because something disappears down your toilet does not mean it won't cause a problem in your sewer pipe – or further down the line at wastewater treatment facilities. Items labeled as

---

[1] http://news.wef.org/stop-dont-flush-that

"flushable" or "disposable" (even "bio-degradable" ones) can get caught on roots in sewer pipes and contribute to blockages, back-ups, and overflows.

Dispose of them in the trash, not the toilet![2]

36.     In Miami-Dade, several incidents have been reported by home owners experiencing problems with the plumbing and clogged pipes. Sewer officials have stated:

When you flush them [wipes] down they get stuck right here in the joint. Right there in the joint and eventually three or four or five of them plug up the water from going through.

Even Consumer Reports couldn't get flushable wipes to dissolve in their lab after ten minutes in a similar slosh test. The wipes didn't even dissolve after ten minutes in a mixer!

So for the sake of your pipes, the best thing to do it not flush any wipes … just toilet paper. Everything else should go in the trash can.[3]

37.     In Port St. Lucie, FL, utility workers are experiencing expensive damage caused by cleansing wipes that are marketed as "flushable."  The wipes that travel farther into the drainage systems, cause even bigger, more expensive problems.  Ty Kontrath, a local plumber in the Port St. Lucie, FL area states:

Just use your regular toilet paper. Anything other than that, just wrap it up and throw it in the waste pail to avoid costly plumbing issue. [4]

38.     All containers of Defendants' products sold in the United States are misbranded, falsely labeled, and as such are illegal.

39.     Their sale constitutes violations of the Food, Drug and Cosmetic Act ("FDCA"), the Florida Deceptive and Unfair Trade Practice Act pursuant to Fla. Stat. §§ 501.201-501.213 (2014), False Advertising pursuant to Fla. Stat. § 817.44 (2014), Breach of Express Warranty;

---

[2] http://www.casaweb.org/flushable-wipes
[3] http://miami.cbslocal.com/2014/02/04/the-trouble-with-wipes-in-your-pipes
[4] http://www.abc15.com/news/national/flushable-cleansing-wipes-actually-cause-plumbing-problems-some-experts-say1380045859003

Breach of Implied Warranties for Merchantability and Usage of Trade Pursuant to Fla. Stat.

§§672.313-672.314 (2014), Breach of Implied Warranty pursuant to Uniform Commercial Code

§2-314 (2014), Negligence and Unjust Enrichment.

40.    With the biodegradable and septic tank benefits of "flushable" products becoming

widely known, consumer demand for these products has increased rapidly. It was this enormous

market that Defendants hoped to tap with the sale of its products.

41.    Defendants knowingly and intentionally sold these misbranded and falsely labeled

products to consumers (including Plaintiffs) with the intent to deceive them.

42.    Plaintiff purchased Defendants' products within the Class Period.

43.    Defendants' products mislead consumers into believing the products were

"flushable" in its consistency and appropriate to dispose of by flushing down a toilet.

44.    Had Plaintiffs known that Defendants' products were not "flushable," Plaintiffs

would not have purchased Defendants' products.

45.     Had Plaintiffs known that Defendants' products were illegally sold products,

Plaintiffs would not have purchased the same.

46.    Plaintiffs' reliance was reasonable, as a reasonable consumer would have been

misled by Defendants' actions.

46.    With respect to Defendants' products, Defendants have violated the FDCA and

regulations promulgated thereunder.

47.    21 U.S.C. 321(i) provides in part the following:

The term "cosmetic" means (1) articles intended to be rubbed, poured, sprinkled,
or sprayed on, introduced into, or otherwise applied to the human body or any part
thereof for cleansing, beautifying, promoting attractiveness, or altering the
appearance, and (2) articles intended for use as a component of any such articles;
except that such term shall not include soap.

48.     21 C.F.R. 701.20(b) provides the following:

Products intended for cleansing the human body and which are not ''soap'' as set
out in paragraph (a) of this section are ''cosmetics,'' and accordingly they are
subject to the requirements of the act and the regulations thereunder.

49.     Defendants' Flushable Wipes are cosmetics as defined by 21 U.S.C. 321 and 21

C.F.R. 701.20(b).

50.     The FDCA was enacted by Congress to protect consumers from unsafe or

deceptively labeled or packaged products by prohibiting the movement in interstate commerce of

adulterated or misbranded food, drug devices and cosmetics.

51.     21 U.S.C. 362 provides in part the following:

A cosmetic shall be deemed to be misbranded—

(a) If its labeling is false or misleading in any particular.

52.     The Fair Packaging and Labeling Act ("FPLA"), enacted in 1967, was designed to

facilitate value comparisons and to prevent unfair or deceptive packaging and labeling of many

household "consumer commodities."

53.     21 U.S.C. 331 provides the following:

The following acts and the causing thereof are prohibited: (a) The introduction or
delivery for introduction into interstate commerce of any food, drug, device,
tobacco product, or cosmetic that is adulterated or misbranded.

54.     Defendants have violated the provisions of 21 U.S.C. 362 by

manufacturing, marketing, and labeling its products in a false and misleading manner.

Defendants have violated the provisions of 21 U.S.C. 331 by introduction and delivery of

misbranded cosmetics.

55.     21 U.S.C. 1.21 provides in pertinent part:

(a) Labeling of a food, drug, device, or cosmetic shall be deemed to be misleading
if it fails to reveal facts that are:

(1) Material in light of other representations made or suggested by statement, word, design, device or any combination thereof; or

(2) Material with respect to consequences which may result from use of the article under:
  (i) The conditions prescribed in such labeling or
  (ii) such conditions of use as are customary or usual.

56.    Labeling may be considered misleading not only because a label statement is deceptive but also because a material fact is not revealed on a label. A fact may be material in light of a statement made on a label or because certain consequences may result from the recommended use of a product.

57.    Defendants have violated the provisions of 21 U.S.C. 1.21 by failing to reveal material facts that its Flushable Wipes are not in fact "flushable."

58.    According to Senate Report No. 493 and recent court decisions, the legal definition of the term "intended" with respect to the use of a product, is its directed or prescribed use as determined from the statements made on a product's label or labeling

59.    Consumer product companies intend for consumers to rely upon their products' labels, and reasonable consumers do, in fact, so rely.  Those labels are the only available source of information consumers can use to make decisions on whether to buy "flushable" consumer products.

60.    As a result of its false and misleading labeling, Defendants were able to sell their products to thousands, if not hundreds of thousands of consumers, throughout the United States and Florida, and to profit handsomely from these transactions.

61.    Defendants had knowledge of the false representations that were made regarding their products, insofar as all of those representations appeared on the Defendants' products' packages.

62.     Defendants had knowledge of the inability of the products in question to dissolve in wastewater like toilet paper does.

63.     Defendants are governed by and have knowledge of the federal regulations that control the labeling of its products and, thus, were aware that the products were able to be properly disposed of by flushing down a toilet. Defendants have spent much time and money in developing and testing its products, such that it was aware its products were not flushable.

64.     As such, Defendants had knowledge of all facts demonstrating that their "Flushable Wipes" were in fact not flushable or appropriate to dispose by flushing down a toilet and that the products were falsely labeled.

65.     The misrepresentation and omissions were uniform and were communicated to Plaintiffs, and to each member of each class, at the point of purchase and utilization.

66.     Plaintiffs read and reasonably relied on the labels as described herein when buying Defendants' products. The package labels of Charmin Wipes in question appear as follows:



67. On the back of the package, Defendants falsely represents that the Charmin Wipes are "septic safe," "flushable," and "safe for sewer and septic systems." Defendants intentionally failed to

disclose that the wipes are not suitable for disposal by flushing down a toilet, and rather, are not considered flushable by municipal sewage systems as the Flushable Wipes routinely cause damage to sewer pipes or create clogs. Defendants' products do not disperse, disintegrate, or biodegrade like toilet paper.

      67.     Plaintiffs read and reasonably relied on the labels as described herein when buying Defendants' products. The package labels of the Pampers Wipes in question appear as follows:



On the back of the package, Defendants further mislead consumers by informing them that the product is "sewer and septic safe." Also on the package, Defendants state "SAFE FOR SEWER

AND SEPTIC. FOR BEST RESULTS, FLUSH ONLY ONE OR TWO WIPES AT A TIME. DO NOT USE IN BASEMENT TOILETS WITH EJECTOR PUMPS."

68.     Defendants maintain two websites for the Kandoo products. On one, Defendants falsely inform consumers that "Flushable Wipes" are "flushable & biodegradable" and "safe for sewer and septic systems." [5] On neither website do the Defendants disclose to their consumers that the wipes are not suitable for disposal by flushing down a toilet.

69.     To encourage consumers into relying on the false representation that the wipes are "flushable," Defendants' advertisements routinely inform consumers that the Flushable Wipes are a useful part of good bathroom habits. For example, on the Charmin website, Defendants state:

> Ever feel like something's missing? Find your better half with Charmin Freshmates. These flushable wet wipes provide a cleaner clean than dry bath tissue alone. When two things are so good together, why keep them apart? Pair your Charmin toilet paper with Charmin Freshmates to feel fresh and clean."

This deceptive advertisement results in consumers believing that the wipes are flushable like toilet paper, when in fact, they are not appropriate to dispose of by flushing down a toilet. Consumers believe that because the Flushable Wipes disappear when flushed down the toilet, they are "flushable." However, the Flushable Wipes do not disperse like toilet paper, and by flushing the Flushable Wipes, consumers risk damaging pipes, septic tanks, and sewage systems.

70.     Due to the deception of its consumers, Defendants are able to charge a premium price for the Flushable Wipes. For example, a 40-count package of Charmin Wipes retails for $8.99 on Amazon.com, considerably higher price than a 40-count package of Wet Ones, a popular brand of non-flushable wipes, which retails for $2.28 on the same website.

---

[5] http://www.kandookids.com/ - Kandoo Kids

71.    A consumer can purchase 350 Pampers Wipes for $13.59 on Amazon.com. On the contrary, a 448 count box of P&G's Pampers® Sensitive Wipes, a non-flushable product, sells for $10.97 on Amazon.com. A 448 count package of Huggies Soft Skin Baby Wipes, a non-flushable product manufactured by another company, sells for $11.97. A 350 count package of the non-flushable Seventh Generation® "Original Soft and Gentle Free & Clear Baby Wipes" sells for $12.99 on Amazon.com.

72.    If consumers knew that the Flushable Wipes were not suitable for flushing down a toilet, they would not pay a premium, but rather, would opt to purchase the cheaper, non-flushable items.

73.    Plaintiffs relied on Defendants' labeling, and based and justified the decision to purchase Defendants' products in substantial part, on these labels.

74.    At point of sale, Plaintiffs did not know, and had no reason to know, that Defendants' products were not "flushable" or inappropriate to dispose of by flushing down a toilet.

75.    At point of sale, Plaintiffs did not know, and had no reason to know, that Defendants' products were unlawful and misbranded.

76.    Had Plaintiffs been aware of these material facts, they would not have bought Defendants' products.

77.    As a result of Defendants' unlawful misrepresentations, Plaintiffs and millions of others in Florida and throughout the United States purchased Defendants' products.

78.    Defendants' labeling as alleged herein is false and misleading and was designed to increase sales of the Defendants' products.

79.    Defendants' misrepresentations are part of its systematic labeling practice.

80. A reasonable person would attach importance to Defendants' misrepresentations in determining whether to purchase Defendants' products.

81. Plaintiffs' purchase of Defendants' products damaged them.

82. Such purchases damaged Plaintiffs because, *inter alia*, misbranded products are illegal and have no economic value.

83. Such purchases damaged Plaintiffs because, *inter alia,* Plaintiffs had cheaper alternatives available and paid an unwarranted premium for Defendants' products.

84. All purchasers of Defendants' products were injured.

85. The Flushable Wipes are all manufactured using the same paper blend, a spunlaced wetlaid paper, which is made by mechanically intertwining wood and pulp fibers using water jets. In reality, the paper is not suitable for flushing down a toilet, since it does not break up after flushing, and routinely clogs pipes and pumps.

86. A consumer who purchases the Flushable Wipes will find, upon opening the package, sheets of moist paper, dampened by a coating of wet lotion. Unlike toilet paper, which is a dry paper product designed to fall apart in water, all of the Flushable Wipes are sold as pre-moistened products, and thus, the spunlaced wetlaid paper used to make them is designed to withstand months of soaking in a wet environment. Because weeks, months, or longer will pass between the time the Flushable Wipe is manufactured and the time at which it is ultimately used by a consumer, the paper used to manufacture the wipes must be strong enough to sit in a still, wet environment for extremely long periods of time. Thus in selecting the paper used to manufacture their Flushable Wipes, Defendants must first consider whether the paper is strong enough to withstand months of soaking in wet environment, suggesting that the wipes cannot possibly efficiently disperse when placed in more water.

17

87.     When P&G tests the flushability of Defendants' wipes, it uses "industry guidelines." P&G has stated that it applies industry guidelines to its "flushable products for years." [6]

88.     The "industry guidelines" that Defendants claim their Flushable Wipes satisfy are set by INDA, a lobbying association for manufacturers of flushable wipes, and Defendants consult on those standards. INDA fights aggressively against governmental efforts to regulate the sale of flushable wipes or use of the word "flushable". The non-mandatory INDA guidelines encourage manufacturers of flushable wipes to conduct a series of seven tests before labelling their products as "flushable." Closer look at those tests reveals flaws in their design and demonstrates that merely passing these self-serving guidelines does not mean the wipes are flushable.

89.     P&G maintains and operates a "Flushability Lab" where it tests all products, including the Charmin Wipes and Pampers Wipes, according to the flawed industry guidelines. In 2008, P&G describes the lab as follows:

> P&G's Flushability Lab is a unique facility created in 1993. Thousands of products and prototypes have been tested here to evaluate compatibility with waste disposal systems in Europe, North America, and Asia. The Lab conducts extensive field and home-usage tests to determine each product's effect on toilets, drain lines, sewage pumps, septic tanks, and aerated on-site systems, as well as municipal collection and treatment systems. Products designed to be flushable are fully evaluated before they are placed on the market. [7]

All of Defendants Flushable Wipes have been subjected to the same tests in P&G's Flushability Lab.

90.     For example, in the Flushability Lab, P&G tests the wipes using the "Slosh Box

---

[6] http://www.angieslist.com/articles/wastewater-experts-skeptical-flushable-wipes.htm

[7] https://www.pg.com/en_US/downloads/sustainability/pov/EnvBrochure2008.pdf

Disintegration Test" or "FG502" test. The test assesses the potential for a product to disintegrate when it is submerged in water and subject to agitation. To conduct the test, the test material is placed in a box of water. Testers then agitate the water, often by simulating the swirl of a toilet flush or the movement of water in a pipe, and time how long it takes for the test material to disintegrate. Defendants and INDA have agreed that the standard for "passing" this test is not whether the product mimics the easily flushable and dispersible toilet paper or even that the product will break down during a flush. Rather, the test only requires that after three hours of agitation in the slosh box, more than 25% of the wipe passes through a 12.5 millimeter (roughly a half inch) sieve 80% of the time. [8] In other words, the test is still passed even if after more than three hours of agitation, nearly three-quarters of the material is unable to pass through the sieve.

91.    When subject to the Slosh Box Disintegration Test, a typical piece of toilet paper begins to break down as soon as the water in the slosh box begins to move, and is completely disintegrated within in a few seconds. [9]  Thus, when flushed down a toilet, toilet paper will likely break into particles within seconds after flushing. *Id.*  Because Defendants products require a much longer time to disperse, Defendants and INDA have agreed that they can label their products as "flushable" provided they pass the much weaker Slosh Box test standard.

92.    The Slosh Box test is flawed because wastewater utility officials say that wipes can reach a sewage treatment pump in as quickly as a few minutes, much faster than the hours needed for Defendants' wipes to begin to break down. [10] Furthermore the moist lotion used in manufacturing the wipes results in them traveling faster through sewer pipes than ordinary

---

[8] http://www.njwea.org/pdf/2013-guidelines-for-assessingthe-flushability-of-disposable-nonwoven-product.pdf
[9] http://www.consumerreports.org/cro/video-hub/home--garden/bed--bath/are-flushable-wipes flushable/16935265001/22783507001
[10] http://www.washingtonpost.com/local/trafficandcommuting/flushable-personal-wipes-cloggingsewer-systems-utilities-say/2013/09/06/9efac4e6-157a-11e3-a2ec-b47e45e6f8ef_story.html

products. [11]

93.     Because the wipes are always intact after a few minutes, and largely intact even after hours of agitation, they arrive at the sewage treatment pump intact, where they create the problems described herein.

94.     Nearly all the tests conducted by P&G in the Flushability Lab are further flawed as they do not simulate real-world conditions. Sewer systems typically move sewage to the plant via gravity.  The flowing water is not as hard on the wipes as the agitating water in some of Defendants' tests, meaning that they will not break down as quickly in the pipes as they do in Defendants' lab simulated tests. *Id*.  For example, both the Slosh Box test and FG505, the "Aerobic Biodisintegration" test, assess the wipes' abilities to disintegrate under constantly agitated water. [12]  Since the Flushable Wipes are unlikely to be subjected to the same agitating water as they are subjected to in Defendants' lab, the tests are not reliable predictors of whether the Flushable Wipes are suitable for flushing down a toilet. The result is that many of the Flushable Wipes arrive at the sewage treatment plant in tact or insufficiently broken down.

95.     The tests are further flawed in that they fail to take into account the wipes propensity for "ragging." After being flushed down the toilet, the Flushable Wipes have a propensity to tangle amongst one another and with other debris, and form long ropes that can fill sewer lines for tens of feet. [13] The tests however, assume that wipes are passing through pipes and pumps one at a time, instead of in clumps of rags and ropes. For example, while the Slosh Box Disintegration Test only considers what one wipe will do, there will often be multiple wipes

---

[11] http://www.woai.com/articles/woai-local-news-119078/disposable-wipes-causing-nightmare-forsan-11718265/
[12] http://www.njwea.org/pdf/2013-guidelines-forassessing-the-flushability-of-disposable-nonwoven-product.pdf
[13] http://www.hsconnect.com/page/content.detail/id/590706/Concerns-on-wipes-no-laughingmatter.html?nav=5005

in a pipe at a time. The bigger the mass of wipes, the slower the disintegration time. [14]

96.     The FG507 Municipal Pump Test, which evaluates the wipes' "compatibility" with municipal pumping systems, is flawed for the same reason. To conduct that test, Defendants and INDA have agreed to only introduce into the pump one wipe every ten seconds to assess whether the pump can process the wipes. [15] Because the wipes will likely entangle with other wipes and debris, the test is a poor predictor of the wipes "compatibility" with municipal pumping systems.

97.     Municipalities all over the country have experienced numerous problems from Defendants' Flushable Wipes.

98.     In Hillsborough County, Florida, the sewage treatment facility has hooked ropes to pumps that are plagued by clogs from the wipes. Every day, teams of plant maintenance mechanics and other workers remove the wipes using the hooks, so that they can cut and untangle the wipes, which resemble "mop strings", using pliers, screwdrivers, and cutters. [16]

99.     In Arkansas, the Jacksonville Wastewater Utility has found that wipes wreck the most havoc on pumps, causing thousands of dollars in damages. Years ago, the town would remove pump clogs once or twice a year, but since the flushable wipes have become popular amongst consumers, the town must remove pump clogs several times a month. [17]

100.    In El Dorado Hills, California, a recent sewage spill was found to be caused in large part by disposable wipes. The result was not only extra maintenance costs, but the city was

---

[14] http://www.washingtonpost.com/local/trafficandcommuting/flushablepersonal-wipes-clogging-sewer-systems-utilities-say/2013/09/06/9efac4e6-157a-11e3-a2ecb47e45e6f8ef_story.html
[15] http://www.njwea.org/pdf/2013-guidelines-for-assessing-the-flushability-of-disposable-nonwoven-product.pdf, p. 18
[16] http://www.tampabay.com/news/humaninterest/flushable-bathroom-wipes-get-blame-for-sewerclogs/2144911
[17] http://www.arkansasmatters.com/story/wastewater-treatment-facilities-waging-war-withwipes/d/story/1ZNQd1uAZECshHMb5daErA

fined by the state for the spill. [18]

101.    Defendants repeatedly have insisted that these problems are caused by other nonflushable products, and not their wipes. In response, Contra Costa sewer officials dyed several kinds of wipes to see what happens once they enter the sewer system, and found that wipes labeled "flushable" were still intact after traveling a mile through sewage pipes. [19]

## CLASS ACTION ALLEGATIONS

102.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of the following class:

> All persons in Florida who, within the Class Period, purchased Charmin and/or Pampers Flushable Wipes manufactured, marketed or sold by Proctor & Gamble and/or Nehemiah Manufacturing Company.

103.    The following persons are expressly excluded from the Class: (1) Defendant and its subsidiaries and affiliates; (2) all persons who make a timely election to be excluded from the proposed Class; (3) governmental entities; and (4) the Court to which this case is assigned and its staff.

104.    This action can be maintained as a class action because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable.

105.    **Numerosity:** Based upon Defendants' publicly available sales data with respect to P & G Products, it is estimated that the Class numbers are potentially in the millions, and the joinder of all Class members is impracticable.

106.    **Common Questions Predominate:** This action involves common questions of law and fact applicable to each Class member that predominate over questions that affect only

---

[18] http://www.mtdemocrat.com/news/flushable-wipes-clogpipes-trash-them-instead/
[19] http://www.contracostatimes.com/news/ci_24156213/popular-bathroom-wipes-blamed-sewerclogs

individual Class members. Thus, proof of a common set of facts will establish the right of each

Class member to recover. Questions of law and fact common to each Class member include, for

example:

    a.    Whether Defendant engaged in unfair, unlawful or deceptive business practices

        by failing to properly package and label P & G Products sold to consumers;

    b.    Whether the paper products at issue were misbranded or unlawfully packaged and

        labeled as a matter of law;

    c.    Whether Defendant made unlawful and misleading claims regarding the

        "flushable" characteristic of the P & G Products;

    d.    Whether Defendant violated Florida's Consumer Protection Statues §§501.201-

        501.213 (2014), Florida Deceptive and Unfair Trade Practice Act, False

        Advertising pursuant to Fla. Stat. § 817.44 (2014), Breach of Express Warranty;

        Breach of Implied Warranties for Merchantability and Usage of Trade Pursuant to

        Fla. Stat. §672.314 (2014), Breach of Implied Warranty pursuant to Uniform

        Commercial Code §2-314 (2014).

    e.    Whether Plaintiffs and the Class are entitled to equitable and/or injunctive relief;

    f.    Whether Defendants' unlawful, unfair and/or deceptive practices harmed

        Plaintiffs and the Class;

    g.    Whether Defendant acted negligently by its deceptive practices;

    h.    Whether Defendant was unjustly enriched by its deceptive practices.

    107.    **Typicality:** Plaintiffs' claims are typical of the claims of the Class because

Plaintiffs purchased Defendants' products during the Class Period. Defendants' unlawful, unfair,

and fraudulent actions concern the same business practices described herein, irrespective of

where they occurred or were experienced. The injuries of each member of the Class were caused directly by Defendants' wrongful conduct. In addition, the factual underpinning of Defendants' misconduct is common to all Class members and represents a common thread of misconduct resulting in injury to all members of the Class. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the Class members and are based on the same legal theories.

108.    **Adequacy:** Plaintiffs will fairly and adequately protect the interests of the Class. Neither Plaintiffs nor their counsel have any interests that conflict with or are antagonistic to the interests of the Class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and those of the members of the Class. Plaintiffs and their counsel have the necessary resources to adequately and vigorously litigate this class action, and Plaintiffs and their counsel are aware of their fiduciary responsibilities to the Class members and will diligently discharged those duties by vigorously seeking the maximum possible recovery for the Class.

109.    **Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendants and result in the impairment of Class members' rights and the disposition of their interests through actions to which they are not parties. Class Action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would create. Further, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation would make it difficult or

impossible for individual members of the Class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Class treatment of common questions of law and fact would also be superior to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the Court and the litigants, and will promote consistency and efficiency of adjudication.

110.    The prerequisites to maintaining a class action for injunctive or equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) are met as Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate injunctive or equitable relief with respect to the Class as a whole.

111.    The prerequisites to maintaining a class action pursuant to Fed R. Civ. P. 23(b)(3) are met as questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

112.    Plaintiffs and their counsel are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

113.    Plaintiffs are members of the Class they seek to represent.  Plaintiffs' claims are typical of the Class members' claims. Plaintiffs will fairly and adequately protect the interests of the Class in that Plaintiff's claims are typical and representative of the Class.

114.    There are no unique defenses that may be asserted against Plaintiffs individually, as distinguished from the Class. The claims of Plaintiffs are the same as those of the Class.

115.    This class action is superior to any other method for the fair and efficient adjudication of this dispute.

## CAUSES OF ACTION

### COUNT I

### VIOLATION OF FLORIDA CONSUMER PROTECTION ISTATUTES §501.201- §501.213, FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

116.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 115 above as if fully set forth herein.

117.    Defendants' conduct constitutes unlawful, unfair and deceptive business acts and trade practices.

118.    Defendants sold their product in Florida during the Class Period.

119.    Florida Consumer Protection Statue §501.204 (2012) prohibits any "unlawful," "fraudulent" or "unfair" business act or practice and any false or misleading advertising. For the reasons discussed above, Defendants have engaged in unfair, false, deceptive, untrue and misleading advertising in violation of Fla. Stat. §§501.201-501.213 (2014).

120.    The Florida Deceptive and Unfair Trade Practices Act also prohibits any, "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in conduct of any trade or commerce." Defendants have violated Fla. Sat. §501.204's prohibition against engaging in unlawful acts and practices by, *inter alia,* making the false and deceptive representations, and also through its omissions of material facts, as set forth more fully herein, and violating 21 U.S.C. §342, 21 U.S.C. §343, 21 U.S.C. §379aa-1, 15 U.S.C. §45 (a)(I), 49 Fed. Reg. 30999 (Aug. 2, 1984), Federal Food, Drug and Cosmetic Act §402(f)(1)(A), and the common law.

121.    Plaintiffs and the Class reserve the right to allege other violations of law which constitute other unlawful business acts or practices. Such conduct is ongoing to this date.

122.    Defendants' acts, omissions, misrepresentations, practices and non-disclosures as alleged herein also constitute "unfair" business acts and practices within the meaning of The Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§501.201-501.213 (2014), in that its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributed to such conduct.

123.    As stated in this Complaint, Plaintiffs allege violations of consumer protection, unfair competition, and truth-in-advertising laws in Florida resulting in harm to consumers. Defendants' conduct constitutes violations of the public policies against engaging in false and misleading advertising, unfair competition and deceptive conduct towards consumers as proscribed by Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§501.201-501.213 (2014).

124.    There were reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described herein.

125.    Defendants' false claims, nondisclosures and misleading statements, as more fully set forth above and collectively as a scheme, were intentionally misleading and likely to deceive the consuming public within the meaning of Florida Deceptive and Unfair Trade Practices Act.

126.    Defendants' deceptive conduct constitutes a prohibited practice, which directly and proximately caused and continues to cause substantial injury to Plaintiffs and the other Class members. Plaintiffs and Class members have suffered injury in fact, actual damages, and have lost money as a result of Defendants' unlawful, unfair and fraudulent conduct.  Plaintiffs' damages are the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered

27

according to the contract of the parties.  Defendants' deceptively labeled, and falsely advertised, and misbranded products have little to no market value.

127.    Unless restrained and enjoined, Defendants will continue to engage in the above-described conduct. Accordingly, injunctive relief is appropriate.

128.    Plaintiffs, on behalf of himself, and all others similarly situated, seek restitution and disgorgement of all money obtained from Plaintiffs and the members of the Class collected as a result of unfair competitions, an injunction prohibiting Defendants from containing such practices, corrective advertising, including providing notification of the product's health risks, and all other relief this Court deems appropriate, consistent with Florida Deceptive and Unfair Trade Practices Act.

## COUNT II

### VIOLATION OF FLORIDA INTENTIONAL
### FALSE ADVERTISING STATUTE §817.44

129.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 115 above as if fully set forth herein.

130.    Defendants knowingly and intentionally engaged in false advertising concerning the true characteristics of the disposable quality of their products. Defendants' conduct was consumer-oriented and this conduct had a broad impact on consumers at large.

131.    Defendants' actions were unlawful and under the circumstances, Defendants had actual knowledge of the falsity, or at the very least ought to have known of the falsity thereof.

132.    Fla. Stat. § 817.44 (2014) defines "false advertising," as, "invitations for offers for the sale of any property, real or personal, tangible or intangible, or any services, professional or otherwise, by placing or causing to be placed before the general public, by any means

whatever, an advertisement describing such property or services as part of a plan or scheme with the intent not to sell such property or services so advertised."

133.    Defendants intentionally, and falsely advertised P & G Wipes as being "flushable" and appropriate to dispose by flushing down a toilet in Florida and throughout the United States.

134.    As fully alleged above, by intentionally and knowingly advertising, marketing, distributing and selling the mislabeled P & G Products to Plaintiffs and other members of the Class who purchased the P & G Products in Florida, Defendants engaged in, and continue to engage in, false advertising in violation of Fla. Stat. § 817.44 (2014).

135.    Defendants' misleading marketing, advertising, packaging and labeling of the P & G Products were likely to deceive reasonable consumers.

136.    Plaintiff and other members of the Class who purchased the P & G Products in Florida were deceived.

137.    Absent such injunctive relief, Defendants will continue to falsely and illegally advertise the P & G Products to the detriment of consumers in the state of Florida.

138.    As a direct and proximate cause of Defendants' violation of Fla. Stat. § 817.44 (2014), Plaintiffs and the members of the Class who purchased the P & G Products in Florida were injured when they paid good money for these illegal and worthless products.

139.    As a result of Defendants' unlawful false advertising practices, Plaintiffs and the members of the Class who purchased the P & G Products in Florida, are entitled to an order enjoining such future conduct and such other orders and judgments which may be necessary to disgorge Defendants' ill-gotten gains and to restore to Plaintiffs and the members of the Class any money paid for the P & G Products pursuant to Fla. Stat. § 817.44 (2014).

140.    Plaintiffs and the members of the Class are also entitled to attorneys' fees.

## COUNT III

### BREACH OF EXPESS WARRANTY; BREACH OF IMPLIED WARANTY; MERCHANTABILITY; USAGE OF TRADE PRUSUANT TO §§ 672.313-672.314 FLORIDA STATUTES

141.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 115 above as if fully set forth herein.

142.    Plaintiffs, and each member of the Class, formed a contract with Defendants at the time Plaintiffs and the other members of the Class purchased the P & G Products. The terms of that contract included the express and implied promises and affirmations of fact that the product was "flushable," and appropriate to dispose of by flushing down a toilet. The P & G Products' packaging and advertising constitute express and implied warranties, became parts of the basis of the bargain, and are parts of a standardized contract between Plaintiffs and the members of the Class on the one end, and Defendant on the other.

143.    At all times, and as detailed above, Defendants expressly warranted that its products were safe, effective and fit for use by consumers, including Plaintiffs and the Class, for their intended use, that they were of merchantable quality, and that they did not produce dangerous side effects.

144.    At the time of making these and other express and implied warranties with respect to the disposable nature of P & G Products, Defendants knew or should have known that it had breached the terms of the contract, including the express and implied warranties with Plaintiffs and the Class, by providing the P & G Products named Charmin Freshmates® Flushable Wipes ("Charmin Wipes") and Pampers® Kandoo® Flushable Wipes ("Pampers Wipes"), that proved to not be "flushable" in nature and did not dissolve in wastewater like toilet paper does.

145.    Members of the public, including Plaintiffs, reasonably relied upon the skill and judgment of Defendant, and upon said express and implied warranties, when purchasing P & G Products.

146.    Due to Defendants' illegal conduct as alleged herein, Plaintiffs and the Class could not have known about the true disposable nature of the P & G Products.

147.    As a direct and proximate result of Defendants' breach of its contract, including the breach of express and implied warranties with respect to the P & G Products, plaintiffs suffered injuries as set forth above, entitling Plaintiffs to judgment and equitable relief against Defendants, as well as restitution, including all monies paid for the P & G Products and disgorgement of profits from Defendants received from sales of the P & G Products, attorneys' fees, and costs, as set forth in the Prayer for Relief.

148.    All conditions precedent to Defendants' liability under this contract, including providing Defendant with pre-suit notice, have been performed by Plaintiffs and the Class.

**COUNT IV**

**BREACH OF IMPLIED WARRANTY PURSUANT TO UNIFORM COMMERICAL CODE §2-314**

149.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 115 above as if fully set forth herein.

150.    The Uniform Commercial Code §2-314 provides that, unless excluded or modified, a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of the kind.

151.    At all times, Florida has codified and adopted the provisions the Uniform Commercial Code governing the implied warranty of merchantability. Fla. Stat. §672.314 (2014).

152.    Defendants' products are "goods" as defined in the various states' commercial codes governing the implied warranty of merchantability, including Florida.

153.    As designers, manufacturers, licensors, producers, marketers, and sellers of P & G products, Defendants are a "merchant" within the meaning of the various states' commercial codes governing the implied warranty of merchantability, including Florida.

154    By placing the P & G products in the stream of commerce, Defendants impliedly warranted that the products' claims on their packaging were true, i.e. "flushable."

155.    As merchants of the P & G products, Defendant knew that purchasers relied upon them to design, manufacture, license and sell products that were not deceptively marketed, and in fact members of the public, including Plaintiffs, reasonably relied upon the skill and judgment of Defendant and upon said implied warranties in purchasing and utilizing the P & G products.

156.    Plaintiffs and the Class members purchased the P & G products for their intended purpose.

157.    Defendants' products' defects were not open or obvious to consumers, including Plaintiffs and the Class, who could not have known about the true nature and characteristics of the P & G products.

158.    As a direct and proximate result of Defendants' breach of implied warranties, Plaintiffs and Class members have sustained injuries by purchasing the P & G products, which were not as represented, thus entitling Plaintiffs to judgment and equitable relief against Defendants, as well as restitution, including all monies paid for the P & G products and disgorgement of profits from Defendants received from sales of the products, attorneys' fees, and costs, as set forth in the Prayer for Relief.

## COUNT V

## NEGLIGENCE

159.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 115 above as if fully set forth herein.

160.    Defendants had a duty to represent its products accurately.  Defendants breached that duty by purposefully or negligently making misrepresentations of fact and omissions of material fact to Plaintiffs and the other Class members about the P & G products.

161.    Defendants failed to label or advertise the P & G products in a lawful manner and violated duties owed to consumers by purposefully or negligently engaging in the conduct described herein.

162.    Plaintiffs and the other Class members, as a direct and proximate cause of Defendants' breach of its duties, were damaged by receiving worthless products, or at the very least, misbranded deceptively labeled products.

163.    As described above, Defendants' actions violated a number of express statutory provisions designed to protect Plaintiffs and the Class.

164.    Defendants' illegal actions constitute negligence *per se*.

165.    Moreover, the statutory food labeling and misbranding provisions violated by Defendants are strict liability provisions.

166.    By reason of the foregoing, Plaintiffs and the other Class members have suffered damages in an amount to be determined at trial, together with punitive damages.

## COUNT VI

## UNJUST ENRICHMENT

167.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 115 above as if fully set forth herein.

168.   As a result of Defendants' fraudulent and misleading labeling, advertising, marketing, and sales of the P & G products, Defendants was enriched at the expense of Plaintiffs and the Class.

169.   Defendants sold the P & G products, which was a product that was illegally sold, illegally branded and had no economic value, to Plaintiffs and the Class.

170.   It would be against equity and good conscience to permit Defendants to retain the ill-gotten benefits it received from Plaintiffs and the Class in light of the fact that the products were not what Defendants purported them to be.

171.   Thus, it would be unjust and inequitable for Defendants to retain the benefit without restitution to Plaintiffs and the Class of all monies paid to Defendants for the P & G products at issue.

172.   As a direct and proximate result of Defendants' actions, Plaintiffs and the Class have suffered damages in an amount to be proven at trial.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury of their claims.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually, and on behalf of all other similarly situated persons, pray for judgment against Defendants as follows:

A.   For an order certifying this case as a Class Action and appointing Plaintiffs and their counsel to represent the Class;

B.   That the Court adjudges and decrees that Defendants has engaged in the conduct alleged herein;

C.      Awarding declaratory and injunctive relief as permitted by law or equity, including: enjoining Defendants from continuing the unlawful practices as set forth herein, and directing Defendants to identify, with Court supervision, victims of its conduct and pay them restitution and disgorgement of all monies acquired by Defendants by means of any act or practice declared by this Court to be wrongful;

D.      Ordering Defendants to engage in a corrective advertising campaign;

E.      Awarding Plaintiffs and the proposed Class members damages;

F.      Awarding restitution and disgorgement to Plaintiffs and the other Class members;

G.      Awarding Plaintiffs and the Classes punitive damages;

H.      Awarding Plaintiffs treble damages;

I.      Awarding attorneys' fees and costs; and

J.      Providing such further relief as may be just and proper.

Dated: January 27, 2015

Respectfully submitted,


*/s/ Tim Howard*
Tim Howard, J.D., Ph.D.
Florida Bar No.: 655325
**HOWARD & ASSOCIATES, P.A.**
2120 Killarney Way, Suite 125
Tallahassee, FL 32309
Telephone: (850) 298-4455
Fax: (850) 216-2537
tim@howardjustice.com